ALBERTO-CULVER COMPANY *et al.*, Plaintiffs-Appellants, v. AON CORPORATION *et al.*, Defendants-Appellees (Kalyn Alwin *et al.*, Co-Adm'rs of the Estate of Martin Larry Koppie, Deceased, *et al.*, Interveners; United States Aviation Underwriters, Inc., Intervener-Appellee.)

First District (4th Division)    No. 1—02—3815

Opinion filed May 13, 2004.—Rehearing denied July 22, 2004.

124

Alder, Murphy & McQuillen, of Chicago (Michael G. McQuillen, James F. Murphy, Mark S. Susina, and Austin W. Bartlett, of counsel), for appellants.

Merlo, Kanofsky & Brinkmeier, Ltd., of Chicago (Alan J. Brinkmeier, of counsel), for appellees Aon Corporation and Aon Aviation, Inc.

Richard J. Prendergast and Cozen O'Connor (Matthew T. Walsh, of counsel), both of Chicago, for appellee United States Aviation Underwriters, Inc.

JUSTICE HARTMAN delivered the opinion of the court:

This appeal arises from an aircraft accident involving a Gulfstream G-IV aircraft (G-IV) privately owned by Alberto-Culver Company (Alberto), and being utilized by Aon Corporation and Aon Aviation, Inc. (sometimes collectively Aon). The plane crashed upon takeoff at Palwaukee Municipal Airport (Palwaukee) on October 30, 1996, and was consumed by fire. All four persons aboard perished, including Martin Larry Koppie, chief pilot and captain for Aon Aviation, a subsidiary of Aon Corporation; Robert Hampton Whitener, pilot and captain for Alberto; Arthur Quern, chief executive officer for Aon Risk Management, Inc.; and Catherine Mio Anderson, a flight attendant employed by Executive Jet, whose services were secured by Aon Aviation. The operative facts of the accident itself are set forth in detail in an opinion filed in a previous appeal, *Anderson v. Alberto-Culver USA, Inc.*, 337 Ill. App. 3d 643, 646-47, 789 N.E.2d 304 (2003) (*Anderson*).

Following preceding liability litigation which found Koppie at fault, the present dispute implicates insurance coverage involving the respective insurance companies. Associated Aviation Underwriters (AAU), Alberto's insurers, sought, *inter alia*, a judicial declaration that Aon Aviation and Aon Corporation were not insured under the aircraft insurance policy AAU issued to Alberto. United States Aviation Underwriters (USAU), insurers of Aon Aviation, intervened and successfully moved for cross-summary judgment against AAU and Alberto. The circuit court found that Aon Aviation and Aon Corporation were entitled to coverage under Alberto's policy with AAU, and that AAU has a duty to defend and indemnify Aon Aviation, because AAU's policy was deemed primary coverage, and USAU's coverage was found excessive. Alberto appeals.

Aon Aviation and Alberto each maintained a flight department at Palwaukee, and each operated its own G-IV, a twin-engine jet that requires a two-pilot crew. The instant flight was conducted pursuant to an "Interchange Agreement" entered into on June 7, 1995, by Alberto and Aon, which permitted Aon Corporation and Alberto Culver

to utilize each other's G-IV upon occasion when needed. *Anderson*, 337 Ill. App. 3d at 647-48. Aon Aviation is organized "to own, operate and lease aircraft (but not to offer transportation services to the general public)." As contained in paragraph six of the Interchange Agreement, Aon Aviation and Alberto agreed, *inter alia*, to (1) " 'hold harmless and indemnify the other from loss, expense, damages, claims, or suits which they might suffer as a result of any act or omission of the other party' "; (2) maintain operational control of their own G-IV during use by the other party; and (3) "have, and keep in effect" an aircraft insurance policy with a minimum $150 million value to provide coverage when piloting each other's airplanes. *Anderson*, 337 Ill. App. 3d at 648.

In compliance with the Interchange Agreement, Alberto and Aon separately held nonowned aircraft coverage through their respective insurance policies, applicable to the use of borrowed aircraft. Aon Aviation purchased a $300 million liability policy from USAU covering Aon Aviation for any liability relating to its operation of its owned and nonowned aircraft (USAU policy). Alberto purchased aviation insurance from AAU and other interested insurers,[1] providing Alberto with liability and property damage coverage in connection with its own and nonowned aircraft (AAU policy).

Importantly, neither the USAU policy nor the AAU policy made reference to the Interchange Agreement between Alberto and Aon, nor was any evidence produced by Alberto or Aon requesting that their respective insurance companies make the Interchange Agreement a part of their respective policies of insurance by rider, endorsement or otherwise.

Under paragraph eight of the Interchange Agreement (Paragraph Eight), as required by Federal Aviation Regulations (FAR), both parties agreed to maintain "operational control" of their own aircraft during use by the other party. The Interchange Agreement does not define "operational control"; however, Paragraph Eight refers to the Department of Transportation under the Federal Aviation Administration (FAA) for an explanation of this term.[2] "Operational control" is defined in the Code of Federal Regulations (CFR) as the "exercise of

---

[1]"Other interested insurers" collectively refers to the American Insurance Company, Centennial Casualty Company, Federal Insurance Company, Fireman's Fund Insurance Company, Greenwich Insurance Company, Lumberman's Mutual Casualty Company and Sun Insurance Office of America.

[2]Paragraph Eight provides, in part, that Alberto and Aon Aviation "certify that both G-IVs respectively are each operated under appropriate provisions of FAR 91, subpart D."

authority over initiating, conducting or terminating a flight." 14 C.F.R. § 1.1 (2001). Koppie, listed as chief pilot for Aon Aviation, signed the agreement twice for "Operational Control" and acceptance purposes. *Anderson*, 337 Ill. App. 3d at 648.

The AAU insurance policy obtained by Alberto provides coverage to the "Insured" for "all sums for which the Insured shall become legally obligated to pay as damages because of bodily injury sustained by any person and property damage, caused by an occurrence and arising out of the ownership, maintenance or use of the scheduled aircraft." Alberto was the named insured on the AAU policy. The general policy definitions of the AAU policy define an "Insured" as "(a) any person while using the aircraft with the permission of the Named Insured provided the actual use is within the scope of such permission, and (b) any other person, or organization, but only with respect to his or its liability because of acts or omissions of the Named Insured or of an Insured under (a) above, provided, however, that the insurance afforded under subsections 2(a) and (b) above does not apply to: (i) any person or organization or agent or employee thereof (other than employees of the Named Insured) engaged in *** the operation of *** any flying service, or aircraft or piloting service, with respect to any occurrence arising out of such activity" (Exclusion (i)). No definition of what is meant by "flying service, or aircraft or piloting service" is set forth in the AAU policy.

Lawrence Colton, the former executive vice president and head of general aviation underwriting at AAU, averred by affidavit[3] that the policy language was modified from "charter service" to "flying service" to avoid any implication that a monetary charge or commercial activity was required to trigger the preclusion of coverage for certain permissive users under the AAU policy.

The AAU policy also set forth, in general condition four, a provision of "Other Insurance" which avers, "[e]xcept with respect to insurance specifically purchased by [Alberto] to apply in excess of this policy, if there is other insurance in [Alberto's] name or otherwise, against loss, liability or expense covered by this policy, [AAU] shall not be liable *** for a greater portion of such loss *** than the applicable limit of [AAU's] liability bears to the total applicable [l]imit of [l]iability of all valid and collectible insurance against such loss, liability or expense."

---

[3]The Colton affidavit was submitted in response to USAU's discovery demand, over AAU's objection, that USAU be provided with the reason for AAU's inclusion of such exclusionary language in its policy. No counteraffidavit was ever produced by USAU.

The AAU policy additionally provided Alberto with liability coverage for its use of nonowned aircraft. That part of the policy contained its own condition of "Other Insurance," under which AAU's nonowned coverage was to be in excess of any other insurance available to Alberto, either as "an [i]nsured under a policy applicable to the nonowned aircraft or otherwise."

Similarly, Aon Aviation held nonowned aircraft coverage by obtaining an endorsement to its policy with USAU, which states: "Your business needs may require you [to] rent, borrow, or use aircraft you don't own. For this reason, we've developed this endorsement to expand your liability coverage and your medical coverage to apply while you're using aircraft you don't own." The USAU policy's nonowned coverage endorsement also contains an "other insurance" clause that asserts: "This endorsement provides you with excess insurance. This means that if you have other insurance covering a loss that's also covered by this endorsement, we'll pay claims only when all other valid and collectible insurance covering the loss has been exhausted. Of course, this restriction does not apply to any insurance you purchased in excess of this endorsement."

After the crash, Aon Aviation notified AAU of the accident, seeking coverage under the AAU policy issued to Alberto. Alberto and its insurers (collectively AAU/Alberto) filed a complaint for an insurance coverage declaration on January 17, 1997, seeking, *inter alia*, a judgment that Aon Aviation was not an insured under the AAU policy issued to Alberto.[4] On May 2, 2001, USAU, moved to intervene in the action, which the circuit court allowed on July 5, 2001.

On July 6, 2001, USAU filed an intervening petition containing

---

[4]AAU/Alberto filed its third amended complaint on December 9, 1997. In response, on January 9, 1998, Aon filed a combined motion to dismiss and motion for summary judgment.

On June 17, 1998, Aon filed its answer, affirmative defenses, and counterclaim to AAU/Alberto's third amended complaint. AAU/Alberto filed an answer to the counterclaim alleging, *inter alia*, waiver. The circuit court struck down AAU/Alberto's affirmative defenses, but granted AAU/Alberto leave to file amended affirmative defenses, which it did on February 22, 2000.

Meanwhile, on January 28, 2000, Aon filed its motion for judgment on the pleadings. On March 20, 2000, Aon moved to strike AAU/Alberto's amended affirmative defenses alleging Aon waived coverage under AAU's policy, and the court did so strike AAU/Alberto's defenses in its order entered on April 24, 2000.

On May 15, 2000, the circuit court granted Aon's motion for summary judgment as to the fifth count of AAU/Alberto's third amended complaint alleging assumption of liability by virtue of the Interchange Agreement, and

three claims, namely, that: (1) Aon Aviation is an insured under the AAU policy, (2) it is entitled to defense and indemnity from AAU, and (3) it is covered primarily by Alberto's AAU policy because USAU's policy is exclusively in excess of the AAU policy.

On November 1, 2001, AAU/Alberto filed its fourth amended complaint in which it sought (1) subrogation from Aon Aviation for reimbursement of funds AAU paid to Alberto for the destruction of its aircraft; and a declaratory judgment that (2) Aon Corporation was not a permissive user entitled to coverage, (3) Aon Aviation was engaged in the operation of a flight service thereby precluding coverage, and (4) Aon Aviation waived coverage under the AAU policy pursuant to the Interchange Agreement.

On March 25, 2002, USAU moved for summary judgment on all three claims against AAU/Alberto and on AAU/Alberto's claim regarding the operation of flight service. After a hearing on August 2, 2002, the circuit court ruled that the question of whether Aon Aviation was engaged in a flight service operation did not foreclose coverage under the AAU policy, that AAU has a duty to defend, and to indemnify Aon Aviation since AAU's policy was the primary coverage and USAU's policy was in excess. On August 6, 2002, the court entered its order in accordance with its findings; however, the order did not include a finding of appealability under Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)). The court did not explicitly rule on AAU/Alberto's fifth count regarding Aon Aviation's waiver of coverage.

On August 21, 2002, AAU/Alberto moved the circuit court to reconsider its order, and moved for summary judgment on the fifth count of its complaint as to waiver. Aon Aviation filed a cross-motion for summary judgment on that count. Following a hearing on November 15, 2002, the court denied AAU/Alberto's motion to reconsider, finding that "much was made of newly discovered evidence, but it was discovered prior to the hearing *** and nothing brought forward in the form of a [Supreme Court] Rule 191(b) affidavit that would suggest that allowing additional time *** would create an issue of fact." As to AAU/Alberto's motion for summary judgment on its waiver count, the court found in favor of Aon Aviation and granted its cross-motion for summary judgment, stating that the court's reasoning involved in the August 2, 2002, ruling similarly dictated its ruling

---

ruled that AAU had a duty to defend Aon. AAU/Alberto moved the court to reconsider its order, which was denied on July 20, 2000.

On July 5, 2001, the circuit court granted Aon's renewed motion for judgment on the pleadings as to AAU/Alberto's third claim of its third amended complaint alleging Aon was not insured under the AAU policy.

on the waiver of coverage issue.[5] The final and appealable order was entered on November 21, 2002, wherein the court stayed enforcement of that order and the August 6, 2002, order during pendency of the appeal. AAU/Alberto timely appeals from the court's denial of its motion for summary judgment and the grant of summary judgment in favor of USAU and Aon Aviation (collectively USAU/Aon Aviation).[6]

## I

Summary judgment is granted properly where the pleadings, depositions, admissions and affidavits, which are construed strictly against the moving party and liberally in favor of the opponent (*RLI Insurance Co. v. Illinois National Insurance Co.*, 335 Ill. App. 3d 633, 643, 781 N.E.2d 321 (2002) (*RLI Insurance*)), show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005 (West 2002). Summary judgment is a drastic means of disposing of litigation and should be allowed only when the right of the moving party is clear and free from doubt. *Spirit of Excellence, Ltd. v. Intercargo Insurance Co.*, 334 Ill. App. 3d 136, 144-45, 777 N.E.2d 660 (2002) (*Spirit of Excellence*). Reversal of summary judgment is warranted if, on review, a material issue of fact or an inaccurate interpretation of the law exists. *Spirit of Excellence*, 334 Ill. App. 3d at 145. Summary judgment orders are reviewed *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992) (*Outboard Marine*).

■ In seeking to exclude Aon Aviation from coverage under the AAU policy, AAU/Alberto primarily contends that Aon Aviation waived its right to coverage by virtue of its assent to and execution of the Interchange Agreement. Although the parties have argued extensively, before this court and the circuit court, in furtherance of their respective interpretations of the Interchange Agreement, that contract has

---

[5]On appeal, AAU/Alberto seeks judgment in its favor (1) on the waiver count, (2) on the primary coverage shift count, and (3) on counts stating Aon Aviation was engaged in flight service, thereby excluding coverage for Aon Aviation. Alternatively, AAU/Alberto asks this court to remand the cause for trial.

[6]Aon Aviation claims AAU/Alberto has waived any objection on the circuit court's May 5, 2000, order, where the court ruled AAU had a duty to defend Aon Aviation. The only issue on appeal is whether AAU has a duty to indemnify. AAU/Alberto, however, argues that the notice of appeal pertains to the court's orders from August 6, 2000, and November 21, 2000. The August 6, 2000, order granted summary judgment to Aon Aviation and ruled that AAU is required to defend and indemnify. Therefore, the duty to defend is part of the summary judgment from which this appeal is taken.

only tangential relevance to this appeal, as will be discussed in the following three paragraphs. Rather, this coverage dispute turns on the construction of the AAU policy, without regard to the Interchange Agreement.[7]

First, Aon Aviation did not waive its right to seek coverage under the AAU policy through its execution of the Interchange Agreement. Under general condition seven, the AAU policy disclaims:

"Notice *** or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy[,] *** nor shall the terms of this policy be waived or changed[,] except by endorsement issued to form a part of this policy signed by [AAU]."

As previously noted, the Interchange Agreement was not made an endorsement to the AUU policy and, therefore, cannot operate to waive Aon Aviation's ability to seek coverage thereunder.

Second, beyond having no effect as to waiver, the Interchange Agreement is not determinative as to whether AAU is obligated to indemnify Aon Aviation. Exclusion (a) of Part I of the AAU policy provides that the insurance "does not apply: (a) to liability assumed by the Insured except as provided by Coverage I." Turning to coverage I, entitled "Liability Under Contractual Agreements," the AAU policy states:

"Exclusion (a) of Part I *** does not apply to the assumption by the Named Insured of the liability of others for bodily injury or property damage in any written contract or agreement, provided that the Named Insured submits a copy of all such agreements to [AAU] within a reasonable time ***; however, failure to do so through error or omission shall not prejudice the insurance afforded hereunder. [AAU] reserves the right to charge an additional premium for any such agreement so submitted."

Third, Alberto could not bind AAU to the terms of the Interchange Agreement unless it was endorsed by the AAU policy.[8] Alberto's failure to do so renders the Interchange Agreement noncontrolling in

---

[7]Although beyond the purview of this appeal, contracts for indemnification that are designed to shift the ultimate cost of liability from one party to another are enforceable where they are explicit and do not run counter to public policy (*Allison v. Shell Oil Co.*, 113 Ill. 2d 26, 27, 495 N.E.2d 496 (1986)); however, indemnification contracts will not be construed as indemnifying against a party's own negligence unless such construction is required by clear and explicit language of the contract, or such an intention is expressed in unequivocal terms. *McNiff v. Millard Maintenance Service Co.*, 303 Ill. App. 3d 1074, 1077, 715 N.E.2d 247 (1999).

[8]This reading is based on the aforementioned provisions and is in accord

determining whether coverage for Aon Aviation exists under the AAU policy. The absence of the endorsement does not, however, preclude Aon Aviation from seeking crverage under the AAU policy as an unnamed insured, since any " rror or omission shall not prejudice the insurance afforded" under the AAU policy.

The question of whether coverage exists must be resolved by interpreting exclusion (i) of the AAU policy. The primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed in their agreement. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391, 620 N.E.2d 1073 (1993) (*Crum & Forster*). If the terms of the policy are clear and unambiguous, they must be given their plain and ordinary meaning. *Outboard Marine*, 154 Ill. 2d at 108. Conversely, if the policy language is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer that drafted the policy and in favor of the insured (*American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479, 687 N.E.2d 72 (1997)); however, courts will not strain to find ambiguity in a policy where none exists. *McKinney v. Allstate Insurance Co.*, 188 Ill. 2d 493, 497, 722 N.E.2d 1125 (1999).

■ The rationale for the anti-drafter, or *"contra preferendum,"* rule of construction is that (1) the intent of an insured in purchasing an insurance policy is to obtain coverage and, therefore, any ambiguity jeopardizing such coverage should be construed in a manner consistent with the insured's intent; (2) the insurer is the drafter of the policy and could have drafted the ambiguous provision clearly and specifically (*Smith v. Allstate Insurance Co.*, 312 Ill. App. 3d 246, 254, 726 N.E.2d 1 (1999)); and (3) public policy considerations dictate that a liberal construction in favor of coverage be applied since the recovery of an injured innocent third party is involved. *State Security Insurance Co. v. Burgos*, 145 Ill. 2d 423, 438, 583 N.E.2d 547 (1991). The rule "is intended to aid a party whose bargaining power was less than that of the draftsperson," and may be "inappropriate if both parties are equally sophisticated in the use of language." 5 M. Kniffin, Corbin on Contracts § 24.27, at 292 (rev. 1998). It has been described as applicable "only as a last resort, when other techniques of interpretation and construction have not resolved *** which of two or more possible reasonable meanings the court should choose." 5 M. Kniffin, Corbin on Contracts § 24.27, at 297 (rev. 1998).

-----

with general condition eight of the AAU policy, which provides that "[a]ssignment of interest under this policy shall not bind [AAU] until its consent is endorsed thereon."

Reviewing courts may be "reluctant to use the anti-drafter inference where the adversaries are two insurance companies." *United States Fire Insurance Co. v. Hartford Insurance Co.*, 312 Ill. App. 3d 153, 157, 726 N.E.2d 126 (2000); *Thomas v. Aetna Casualty & Surety Co.*, 28 Ill. App. 3d 363, 366, 328 N.E.2d 374 (1975) (in a dispute involving two insurers, where each is subject potentially to primary liability, "a judicial policy which finds ambiguity in the terms of the policy or directs a liberal construction of such terms is not a dominant principle"); *Associated Indemnity Co. v. Insurance Co. of North America*, 68 Ill. App. 3d 807, 827, 386 N.E.2d 529 (1979) (the precept of construing in favor of coverage "is not as poignant in a suit where the issue to be resolved is which of two insurers affords primary coverage"); 2 Couch on Insurance § 22:14, at 37 (3d ed. 1997) (the rule does not operate in deciding whether a certain person or entity belongs to insured class described in policy).

■ To the extent that Aon Aviation is a sophisticated corporate entity familiar with aviation insurance, having paid no premium for the AAU policy (nor caused AAU to pay an additional premium) and maintained its own separate insurance coverage, application of the *contra preferendum* rule here is inappropriate. Rather, the policy will be construed as a whole, taking into account the type of insurance purchased, the nature of the risks involved and the overall purpose of the contract. *Crum & Forster*, 156 Ill. 2d at 391. The construction of an insurance policy is a question of law subject to *de novo* review. *Spirit of Excellence*, 334 Ill. App. 3d at 151.

■ The policy language at issue is located in exclusion (i) of AAU's policy, which denies coverage to "any person or organization *** engaged in *** the operation of any *** flight service, or aircraft or piloting service." AAU/Alberto concedes that Aon Aviation was using the aircraft with permission, but asserts that "permissive user status is not equivalent to insured status." It maintains that at the time of the accident, Aon Aviation was operating such a service, thus triggering the application of exclusion (i).

USAU/Aon Aviation counters that "service" must be construed to exclude only those entities engaged in "commercial" aircraft operations, not in-house aircraft transportation. It claims this reading is buttressed by the juxtaposition of "flight service" amidst "other, purely commercial activities," including the "operation of any airport, hangar, [or] flying school," where no disjunctive language sets apart the activities. It argues further that the exclusion runs afoul of the stated purpose of the AAU policy, which covers Alberto's aircraft for "[a]ll operations of the Named Insured," one of which was to mutually exchange private aircraft with Aon Aviation. To exclude coverage

for the operations conducted under the Interchange Agreement, it urges, would render illusory the very permissive-user coverage anticipated by the parties and manifested in the Interchange Agreement.

In finding the exclusion inapplicable, the circuit court believed the construction of the AAU policy was contingent on the Interchange Agreement. It commented that the AAU "policy contemplated this interchange agreement that existed between the two plane owners," and "if they [Aon Aviation] operated within that interchange agreement, my impression is this language would not exclude coverage." The court determined the exclusion would operate only if a service was being offered to a "portion of the public that was interested in piloting and aircraft services as opposed to two groups of owners accommodating each other," and ultimately concluded that "if commercial is not something that gives color to the term flight service, then *** there is no coverage [for] [permissive] usage of the aircraft." USAU/Aon Aviation adopts this position on appeal.[9]

The threshold inquiry is whether the language at issue is ambiguous. Although USAU/Aon Aviation notes that the terms are undefined within the AAU policy, the mere absence of a definition does not necessarily render a policy term ambiguous (*Milwaukee Guardian Insurance, Inc. v. Taraska*, 236 Ill. App. 3d 973, 974, 602 N.E.2d 70 (1992)), nor is an ambiguity created simply because the parties disagree about the meaning of the policy language. *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 783, 784 N.E.2d 312 (2002).

Affording the words their plain, ordinary and popular meaning, exclusion (i) is clear and unambiguous in the context of USAU/Aon Aviation's specific challenge—that the activities described must be "commercial" to trigger the exclusion. The qualifying adjective "any," however, invokes the exclusion irrespective of whether the activities may or may not be commercial. Despite USAU/Aon Aviation's insistence that "service" "means commercial activity, *i.e.*, services to the public or others for hire," this reading is neither inherent nor implicit in the language actually employed. "Service" need not connote monetary exchange, and is defined more aptly as a "[d]uty or labor to be rendered by one person to another," or the "[p]erformance

---

[9]AAU/Alberto responds that several categories of permissive users would be "insured" under the AAU policy such as a Federal Aviation Administration inspector conducting a regulatory inspection flight, a potential purchaser of Alberto's aircraft while conducting a test flight, or pilot applicants for Alberto performing test flights. In these circumstances, it maintains, permissive users would be exempt from the exclusion.

of labor for benefit of another, or at another's command." Black's Law Dictionary 1368 (6th ed. 1990). An undefined term in an insurance policy is given its plain and ordinary meaning, which can be obtained from a dictionary. *El Rincon Supportive Services Organization, Inc. v. First Nonprofit Mutual Insurance Co.*, 346 Ill. App. 3d 96, 102 (2004).

USAU/Aon Aviation's ability to locate other definitions more favorable to its position is not compelling. Courts should neither exercise their inventive powers to create an ambiguity where none exists nor approve of the distortion of language to reach a desired result. *American Standard Insurance Co. v. Allstate Insurance Co.*, 210 Ill. App. 3d 443, 447, 569 N.E.2d 162 (1991). By injecting "commercial" into the phrase, the written language supplied and the risks contemplated in writing the policy would be supplanted and distorted unnecessarily, creating an unintended class of insureds.

Were it to be surmised that AAU intended to deny coverage only to those engaged in "commercial" activities, it easily could have chosen the same language USAU did in its policy, where it denies coverage to those operating, *inter alia*, a "commercial flying service or flying school or any person engaged in commercial aviation." Unlike USAU, however, AAU excluded "any" flight service from permissive user coverage, not solely "commercial" flights, which must be enforced as written (*RLI Insurance*, 335 Ill. App. 3d at 648) without alteration by adding new terms. 2 Couch on Insurance § 22:16 (3d ed. 1997).

The placement of "flight service" within the list of other activities does not justify reading "commercial" into the language. This argument presumes each of the activities mentioned is exclusively commercial; however, USAU/Aon Aviation could not argue, for example, that the operation of its own aircraft hangar is commercial where its overarching supposition is that in-house activities of a subsidiary do not constitute commercial activity. Notwithstanding this syllogistic inconsistency, each of the activities listed is modified by the introductory word "any."

Also without merit is USAU/Aon Aviation's reliance on the AAU policy provision which covers "all operations of the Named Insured." Although flights related to the Interchange Agreement may be deemed operations of Alberto, this general policy provision is overridden by specific policy exclusions. Where an inconsistency arises between a clause that is general and one that is more specific, the latter prevails. Restatement (Second) of Contracts § 203(c) (1981); 11 R. Lord, Williston on Contracts § 32:15, at 507, 509-12 (4th ed. 1999). The general

provision does not establish coverage when read in the context of the entire policy.[10]

The circuit court was aware of the terms of the Interchange Agreement and the relevant insurance polices; however, it did not recognize that the AAU policy defeats primary coverage for those flights that were the subject of the Interchange Agreement. As noted above, however, AAU was not a party to the Interchange Agreement, the policy did not endorse the Interchange Agreement, and AAU received no additional premiums for Aon Aviation's coverage. AAU was entitled to implement its policy exclusions without regard to the Interchange Agreement.

The circuit court's grant of summary judgment was unwarranted and, where no material issue of fact remains, the circuit court's ruling is reversed. Aon Aviation is excluded from coverage under the AAU policy as a matter of law.

## II

The parties presented extrinsic evidence before the circuit court. Illinois courts follow the "four corners" doctrine when interpreting contracts, looking primarily to the language of the contract to determine whether it is susceptible to more than one meaning. *Nebel, Inc. v. Mid-City National Bank*, 329 Ill. App. 3d 957, 967, 769 N.E.2d 45 (2002). Generally, parol evidence is inadmissible to vary the terms of a written instrument unless the language used is ambiguous or incomplete. *Zimmerman v. Illinois Farmers Insurance Co.*, 317 Ill. App. 3d 360, 369, 739 N.E.2d 990 (2000).

■ Assuming, *arguendo*, that the language is ambiguous, the collateral evidence overwhelmingly supports the same conclusion. During discovery, USAU/Aon Aviation requested documents pertaining to the drafting history of exclusion (i). As previously explicated in his affidavit, Lawrence Colton, the former executive vice president and overseer of general aviation underwriting at AAU, described the history of exclusion (i). He attested that the AAU policy language was modified from "charter service" to "flying service," in response to an accident involving Twining Aviation, an aircraft charter and rental company. There, the pilot, although insured by another insurer, sought and obtained coverage under the AAU policy, arguing that at the time of the accident, he was flying alone and could not have been operating a "charter" flight. Thereafter, AAU issued an endorsement

---

[10]Permissive-user coverage would not be rendered illusory if "commercial" were absent from the phrase. Although AAU/Alberto has set out various examples of when coverage would apply, even if the AAU policy creates a greater number of scenarios denying coverage than those affording coverage, the force of exclusion (i) remains undiminished.

"modifying the policy language to make it clear that no flying or piloting service conducted by [those] other than the Named Insured, (not just charter or commercial services ***), was entitled to coverage ***. The change was deliberately made and intended to encompass all persons or entities engaged in the operation of a flight service regardless of whether the operation was commercial in nature, regardless whether a charge was made for the operation, and regardless of whether the operation was intended to result in a profit to the operator. The rationale supporting this construction is that persons or entities that operate flying or piloting services should have their own coverage which is specifically designed and placed to appropriately protect their interests. Had [Alberto], through Aon as its broker, made a request for a modification of the basic policy terms, AAU would have considered the broker's request and made a decision on whether or not to make the modification and at what additional cost."

In 1973, AAU introduced its "Golden Wing" policy, which incorporated the definition of an insured as it currently appears in the AAU policy. Colton stated that "[t]he phrase 'aircraft or piloting' was added to more fully describe the types of entities that were precluded from claiming insured status under the policy." The definition of an insured used in the "Golden Wing" policy since has remained unchanged.

A fair and accurate reading of Colton's affidavit undermines USAU/Aon Aviation's contention that it demonstrates "only a broadening of an exclusion that had been limited to certain kinds of commercial activity, so as to include all commercial activity, not an extension to non-commercial activity." If AAU sought to include additional commercial activities, as USAU/Aon Aviation posits, AAU would not have altered the language with the deliberate intention of eliminating any potential inference that commercial activity was a prerequisite to exclusion. The Colton affidavit affirmatively establishes the intent behind exclusion (i), further compelling a finding of no coverage for USAU/Aon Aviation.[11]

## III

■ As a corollary issue, it must be determined whether the USAU

---

[11]USAU/Aon Aviation presents as parol evidence certain inquiry and advisory letters between Alberto and AAU regarding a potential aircraft mutual-use arrangement involving Duchossois Industries and Alberto. The letters reveal only preliminary discussions toward a possible, yet unmanifested written arrangement, one distinct in character from the Interchange Agreement. Although the evidence has been considered duly, it is too general, speculative and indeterminate to shed light on the present coverage dispute.

nonowned aircraft coverage is excess or primary. Pursuant to the USAU policy endorsement for nonowned aircraft, primary coverage is subject to a condition precedent—"all other valid and collectible insurance covering the loss [must be] exhausted." Under the foregoing analyses, the condition has been satisfied and USAU is the primary insurer.

## IV

■ Were this court to read "commercial" into the existing language, the exclusion would apply nonetheless. USAU/Alberto's position rests on the flawed premise that aircraft used for private, inhouse corporate purposes are not "commercial" in nature. This criteria does not embrace the full scope of "commercial" in the aviation context or elsewhere.

In *Airmanship, Inc. v. United States Aviation Underwriters, Inc.*, 559 So. 2d 89 (Fla. App. 1990), USAU argued that a copilot fell within its "commercial aviation" exclusion since he had been paid for his services. The policy did not define the term, but in construing "commercial aviation," the Florida District Court of Appeal stated, "[r]easonable people could differ as to the definition of 'commercial aviation.' Although the term may be understood to encompass the furnishing of compensation for assisting in piloting an aircraft, it could just as easily apply to leasing the aircraft or employing it to carry passengers or freight." *Airmanship*, 559 So. 2d at 91. The lease of an aircraft under these circumstances is "commercial."[12]

As USAU/Aon Aviation acknowledges, an interchange agreement is defined in the Code of Federal Regulations to mean "an arrangement whereby a person leases his airplane to another person in exchange for equal time, when needed, on the other person's airplane, and no charge, assessment, or fee is made, except that a charge may be made not to exceed the difference between the cost of owning, operating, and maintaining the two airplanes."[13] 14 C.F.R. § 91.501(c)(2) (2000).

Since Quern's flight was conducted under the Interchange Agreement, which is by definition a lease, Aon Aviation necessarily engaged

---

[12]Article 2A of the Uniform Commercial Code governs the lease of goods. See U.C.C. § 2A *et seq.* (2000).

[13]The Interchange Agreement provides that both Aon and Alberto "agree[ ] to make the G[-]IV available *** under the privileges and provisions of FAR 91.501 (c)(2)," and that "Alberto may lease their G[-]IV to Aon in exchange for time, when it is needed on Aon's aircraft and no charge, assessment or fee is made. Aon may likewise lease their aircraft to Alberto with the same stipulations."

the operation of a "commercial" activity at the time of the accident, placing it squarely within the scope of exclusion (i).

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is reversed.

Reversed.

GREIMAN and THEIS, JJ., concur.